### AFFIDAVIT SUBMITTED IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Todd Bucci, being duly sworn, deposes and states as follows:

1.      I am a Special Agent with the U.S. Department of Agriculture (USDA), Office of Inspector General (OIG), located in the New England Field Office, Salem, New Hampshire. I have a total of approximately 27 years of law enforcement experience as a Police Officer, Corrections Officer, and Special Agent. I have been employed by the USDA-OIG for approximately fifteen years. Prior to my employment at USDA-OIG I was employed by the U.S. Department of Interior OIG as a Special Agent for approximately five years and was employed as a Special Agent with the U.S. Army Criminal Investigation Command (USACIDC) for approximately five years.  I also served as local police officer in Massachusetts as well as a Military Police Corrections Officer with the U.S. Army for a cumulative total of approximately two years.  During my career, I have conducted numerous investigations involving various financial and major crimes. My current duties involve the investigation of violations of both state and federal statutes in which the USDA has a specified interest as well as related criminal activities, such as theft, wire, mail, bank fraud, program fraud, money laundering, tax fraud, financial transaction card fraud, theft, wrongfully obtaining welfare assistance, racketeering and other white-collar fraud and financial fraud investigations.  As a Special Agent, I have received specialized training and have past experience investigating these types of investigation.

2.      The information contained in this affidavit is based on my personal knowledge and experience, other agents' knowledge and experience, and my review of documents and witness interviews. All dates, times and amounts are approximate.  I have not included every fact that I have learned from this investigation, but only those facts sufficient to establish probable cause for

the issuance of the requested criminal complaint.  Herein, they will be referred to collectively as "investigators" or "the investigators."

## PURPOSE OF AFFIDAVIT

3.    I am participating with agents from the Federal Bureau of Investigation (FBI) in the investigation of ANTONIO BONHEUR, SAUL ALISME, the co-located businesses of JESULA VARIETY STORE and SAUL MACHE MIXE STORE, and others (the "TARGETS") for violations of various criminal offenses related to the theft and trafficking in food stamp benefits and related offenses, including the following, Food Stamp Fraud and Welfare Fraud in violation of 7 U.S.C. § 2024(b), Wire Fraud in violation of 18 U.S.C. §§ 1343, 1349, Bank Fraud in violation of  18 U.S.C. §§ 1344, 1349, Money Laundering in violation of 18 U.S.C. §§ 1956, 1957 and Conspiracy to commit those offenses (the "TARGET OFFENSES").

4.    This affidavit is submitted in support of a criminal complaint charging ANTONIO BONHEUR (dob: xx/xx/1951, ssn: xxx-xx-8592) and SAUL ALISME (dob xx/xx/2001, ssn: xxx-xx-5536), with one count of Food Stamp Fraud Greater than $100 but less than $5,000, in violation of 7 U.S.C. § 2024(b), for a SNAP Benefit trafficking transaction taking place on October 22, 2025, for BONHEUR, and a SNAP Benefit trafficking transaction taking place on October 16, 2025, for ALISME.

## I.    ANTONIO BONHEUR

5.    JESULA VARIETY STORE is owned and operated by ANTONIO BONHEUR (dob: xx/xx/1951, ssn: xxx-xx-8592). BONHEUR is a naturalized United States Citizen.  A photograph of BONHEUR from the Massachusetts Registry of Motor Vehicles follows:



6.      JVS began accepting SNAP Benefits in September 2021.  Over the course of the investigation, investigators have become familiar with JVS. Based upon the investigation of JESULA VARIETY STORE including my investigation of the documents reporting the physical premises of 1549 Blue Hill Avenue, and multiple instances where purchases have been made from JVS, I know that the actual footprint of JVS is comprised of approximately 150 square feet of space.

7.      In addition to trafficking SNAP Benefits for millions of dollars in cash through JESULA VARIETY STORE, BONHEUR also fraudulently applied for SNAP Benefits himself in 2022, claiming to have zero income and failing to list JVS.  Since 2022, BONHEUR has been collecting SNAP Benefits based on this fraudulent application, often conducting transactions at JVS in amounts exceeding $95. Effectively, BONHEUR himself was receiving SNAP Benefits, despite owning a business, and that business itself conducting millions of dollars in SNAP redemptions in the past calendar years.

II.     **SAUL ALISME**

8.      SAUL MACHE MIXE STORE (SMMS) is owned and operated by SAUL
ALISME (dob xx/xx/2001, ssn: xxx-xx-5536).  ALISME is a lawful permanent residence and
citizen of Haiti. ALISME's Haitian Passport was issued in March 2021, and expires in February
2031.  A Social Security card issued for ALISME in November 2024, authorizing ALISME to
work only with authorization from the Department of Homeland Security.  A photograph of
ALISME from the Massachusetts Registry of Motor Vehicles follows:



9.      SAUL ALISME signed an application for SMMS to be a SNAP Authorized retailer
on February 14, 2025.  SMMS began accepting SNAP Benefits on or about May 2025.

## THE INVESTIGATION

10.     The investigation of JESULA VARIETY STORE and SAUL MACHE MIXE
STORE was conducted through multiple undercover transactions where SNAP Benefits were

trafficked by BONHEUR and ALISME for cash, liquor, and other items prohibited by the SNAP program. I also reviewed footage from a stationary camera outside of JESULA VARIETY STORE and SAUL MACHE MIXE STORE and observed multiple transactions for over $100 taking place in a single day, while no customer emerged from the storefront carrying groceries or bags consistent with these large-dollar value transactions.

11.    Knowing from the investigation that JESULA VARIETY STORE and SAUL MACHE MIXE STORE were in fact trafficking SNAP Benefits for cash, investigators reviewed the size of JESULA VARIETY STORE and SAUL MACHE MIXE STORE and products available and compared their size and inventory to the amount of SNAP Benefits being redeemed. Both stores were conducting numerous transactions for over $95 in a single day, and hundreds of such transactions per month, totaling over $30,000 per month for SAUL MACHIE MIXE and over $300,000 for JESULA VARIETY STORE. Simply put, JESULA VARIETY STORE and SAUL MACHE MIXE STORE simply do not have sufficient SNAP eligible food inventory to support the number and value of the transactions.

12.    Additionally, it would be extremely difficult for JESULA VARIETY STORE and SAUL MACHE MIXE STORE to conduct legitimate transactions commensurate wth the amount of SNAP Benefits being redeemed at the stores. For example, JESULA VARIETY STORE and SAUL MACHE MIXE STORE do not have carriages, or handbaskets for their customers. Both stores only have one register and no optical scanners to read barcodes from products. Additionally, JESULA VARIETY STORE and SAUL MACHE MIXE STORE are very small, and as documented below during store visits and the undercover transactions, the stores stock very limited quantities of food that would be eligible to be purchased with SNAP Benefits.

13.    In short, the investigation thus far has revealed that ANTONIO BONHEUR, through his store JESULA VARIETY STORE ("JVS"), has trafficked SNAP Benefits valued over $6,000,000 over a period of more than three years. SAUL ALISME, through his store SAUL MACHE MIXE STORE ("SMMS"), has been trafficking in SNAP Benefits from May 2025, and is believed to have trafficked over $121,890 in SNAP Benefits. JVS and SMMS are located in the same building at 1549 Blue Hill Avenue, Mattapan, MA.

## BACKGROUND REGARDING SNAP PROGRAM

14.    The United States Department of Agriculture, Food and Nutrition Services is the federal agency responsible for the administration and implementation of the Food Stamp Program (FSP) throughout the United States.  The USDA, Food and Nutrition Service ("FNS"), operates a program known as the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the Food Stamp Program ("FSP"). One purpose of SNAP is to provide a means for low income individuals and families to purchase food products for human consumption. Congress enacted the SNAP program to "promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. This program enables low-income households to obtain a more nutritious diet by increasing their food purchasing power.

15.    Under the program, eligible households receive food stamps in the form of credits to an electronic benefit card to buy food from retail food stores that participate in the SNAP program. Food stamp benefits are obligations of the United States and redeemable at face value by the Secretary through the facilities of the Treasury of the United States. 7 U.S.C. § 2024(d). USDA administers the SNAP program nationally. As of October 1, 2008, the official name of the Food Stamp Program changed to the Supplemental Nutrition Assistance Program (SNAP), however,

some of the forms and regulations still refer to the Food Stamp Program.  This affidavit will refer to the Food Stamp Program and SNAP interchangeably.  The Food Stamp Program originally provided assistance to eligible recipients in the form of food stamp coupons.  In the 1990's, the USDA, through the State of Massachusetts Department of Transitional Assistance (MA DTA) converted from traditional paper food stamp coupon system to what is known as an Electronic Benefit Transfer (EBT) card, commonly referred to as an EBT Card.

16.    EBT cards are like credit or debit cards, and in the case of SNAP, the EBT card is linked to the recipients benefit account and credited with the beneficiaries' allocated benefit amount on a monthly basis.  The recipient can redeem benefits at participating retailers.  Redemption is done in a fashion similar to a credit card transaction, either by manually entering the account information or by swiping the EBT card into or through the Point of Sale (POS) device.  The SNAP recipient then enters a personal identification number (PIN) in the machine's external PIN pad to complete the transaction.  The EBT card machine records the EBT card number, the date and time of the transaction and the amount debited from the recipient's EBT account.

17.    Retailers must obtain a license from the USDA Food and Nutrition Service ("FNS") to accept food stamp benefits from eligible recipients as payment for authorized food purchases.  Before receiving authorization to participate in the SNAP program, a retailer is provided with an application to participate in the SNAP program and a book of federal regulations regarding the SNAP program. As part of the application filled out by a retailer seeking to participate in the SNAP program, the retailer is advised of the SNAP regulations, including those prohibiting the retailer from providing cash or ineligible items to recipients in exchange for the recipient's SNAP benefits.

18.    To become eligible to participate in SNAP, store owners in Massachusetts are required to complete, sign and submit a Supplemental Nutrition Assistance Program Application

For Stores, Form FNS 252 (the "252 application") to the USDA. This application includes a certification from the applicant stating that he or she has read and reviewed the program rules and regulations. If USDA FNS authorizes the retailer, an authorization packet is forwarded to the retailer which also discusses the requirements of SNAP. The forms of educational media, through a number of methods, explicitly demonstrate to the retailer that the only allowable use of EBT SNAP benefits is to purchase food. Stores approved by the USDA to participate in SNAP are issued a food stamp authorization number and are provided with a POS device or a swipe device, which debits the recipient's account for the cash value of the eligible items purchased. The vendors are then reimbursed normally within two days for the redemptions via an electronic transfer directly into an authorized user's designated bank account.

19.    FNS has designated what types of items are eligible for purchase using SNAP benefits and what types of items are ineligible for purchase using SNAP benefits. Typical eligible items include bread, cereal, dairy products, fruits, vegetables, meat, poultry, fish, etc. Typical ineligible items include gasoline, tobacco products, alcohol, paper products, cleaning products, etc. It is a violation of the SNAP Program rules and regulations to accept SNAP benefits as payment for ineligible items. Training materials are available upon request in six different languages, including English, Arabic, Spanish, and Korean. Store owners/managers are responsible for training their employees in the proper procedures for the program. Retailers may lose their authorization to redeem SNAP benefits if they break program rules or no longer qualify for participation in the program.

20.    EBT SNAP recipients may exchange EBT SNAP card benefits only for eligible food items and only at stores authorized by Food and Nutrition Services. Authorized stores are prohibited from accepting EBT SNAP benefits in exchange for items such as alcoholic beverages,

tobacco, vitamins or medicines, pet foods, non-food items such as cell phones; cell phone minutes/ring tones, or household goods and clothing. EBT SNAP Benefits may also not be redeemed for cash or to pay down credit accounts at the store. They are only to be used for eligible food items.

## I.    JESULA VARIETY STORE

21.    JVS began accepting SNAP Benefits in September 2021.  Over the course of the investigation, investigators have become familiar with JVS. Based upon the investigation of JESULA VARIETY STORE including my investigation of the documents reporting the physical premises of 1549 Blue Hill Avenue, and multiple instances where purchases have been made from JVS, I know that the actual footprint of JVS is comprised of approximately 150 square feet of space.

22.    This retail area at JVS includes about two or three feet of checkout space near the point-of-sale terminal. There is one register, one point of sale terminal, and no optical scanners to scan items for purchase. There is one row of shelving flanking an open interior area, where inventory can be obtained by customers. There are no visible carriages and essentially no handbaskets. By any fair estimation, JVS is effectively a closet with shelves and a register. I also know from the investigation very few items for sale at JVS are eligible to be purchased with SNAP Benefits.

### A.    STORE VISITS

23.    As part of the program for stores to redeem SNAP Benefits, stores that accept SNAP Benefits are subject to store visits by FNS personnel and contractors employed by FNS. The purpose of these store visits is to document the nature, size and operations of the store and

identify the nature and amount of SNAP Benefit eligible food available in the store.   FNS conducted store visits to JVS in June 2021, March 2024, and March 2025.

24.    On March 17, 2025, members of USDA FNS conducted a store visit at JVS and documented the retail space, inventory, and fixtures. BONHEUR was present during the visit and consented to the store review. USDA FNS agents also photographed the premises. The visit documented the following:

   a.   There was 1 checkout area, 1 cash register, 1 point of sale device, and no optical scanners used to scan bar codes were observed;

   b.   No shopping baskets or shopping carts were observed;

   c.   No freezers were observed, and no meats or seafoods were observed for sale;

25.    The store appears to be comprised of as few shelving units along one wall and along the opposite wall. The counter contained the single point-of-sale terminal and a small shelving unit that sat on the counter. Photographs taken during this store visit follow:









 

26.     Investigators know from the undercover transactions taking place since the most recent store visit, which are discussed below, that JVS still does not have any refrigerators on its premises and does not sell refrigerated meat, refrigerated seafood, or any refrigerated produce. JVS also does not sell refrigerated beverages, dairy products, or eggs or milk.  Of the SNAP eligible foods, it appears that JVS primarily sells dry foods, such as beans, rice, corn, potatoes, and spices.  JVS stocks very few packaged food items that are SNAP eligible. At most, I would estimate a few hundred items to be in inventory at any given time.

27.     Investigators have reviewed the reports of the FNS store visits to JVS in June 2021 and March 2024. The reports of the store visits to JVS show little difference from the March 2025 store visit, including: the physical premises of JVS is in the same location; the physical premises of JVS is the same square footage; the same single cash register with no optical scanner; no handbaskets and no carriages; the amount and type of food available at JVS is generally consistent; and JVS has no refrigerator.

### B.    FNS DOCUMENTS

28.     I have reviewed the FNS documents for JESULA VARIETY STORE.  ANTONIO BONHEUR has submitted two applications to FNS for JVS to accept SNAP benefits. The first application was submitted in May 2021, and the second was submitted in February 2025.

29.     The first application for JVS to redeem SNAP benefits was submitted on May 10, 2021, by ANTONIO BONHEUR. BONHEUR identified the address of JVS as 1549 Blue Hill Avenue, Mattapan, MA, and identified himself as the owner of the store.

    a.   In section 15e of the application, BONHEUR checked the "No" box to the question of whether any officer, owner, partner and/or member was receiving assistance through the SNAP program.

    b.   In section 19 of the application, BONHEUR entered that he had: three varieties of Breads and/or Cereals staple food category; one variety of the Dairy products staple food category; zero varieties of the Meat, Poultry, and/or Fish staple food category; and three varieties of the Vegetables and/or Fruits staple food category.

    c.   In the application, BONHEUR stated that his estimated monthly retail sales were $1,110. BONHEUR stated that there was 1 cash register in the store and that optical scanners are not used.

    d.   In the Certification and Signature section, BONHEUR confirmed his understanding of an agreement with the following:

        i.   Violations of program rules can result in administrative actions such as fines, sanctions, withdrawal or disqualification from the Supplemental Nutrition Assistance Program; violations or the Supplemental Nutrition Assistance Program rules can also result in federal, state and/or local criminal prosecution and sanctions.

        ii.   Owners/officers are responsible for violations or the Supplemental Nutrition Assistance Program regulations, including those committed by any of the firm's employees, firm's employees (paid or unpaid, new, full-time, or part-time). These include violations such as, but not limited to:

            1.   Trading cash for Supplemental Nutrition Assistance Program benefits (I.e. trafficking);

2. Accepting Supplemental Nutrition Assistance Program benefits as payment for ineligible items;

3. Accepting Supplemental Nutrition Assistance Program benefits as payment on credit accounts or loans;

4. Knowingly accepting Supplemental Nutrition Assistance Program benefits from people not authorized to use them;

30.    The signed Certification and Signature section of the May 2021 FNS application for JVS follows.

0757907                                    RECEIVED MAY 14 2021

**CERTIFICATION AND SIGNATURE** - By signing below, you are confirming your understanding of and agreement with the following:

- I am an owner of this firm; or am authorized to represent the firm regarding this reauthorization.

- I have provided truthful and complete information on this form and on any documents provided to the Food and Nutrition Service;

- If I provide false information, my authorization to accept Supplemental Nutrition Assistance Program (SNAP) benefits may be withdrawn;

- Any information I have provided or will provide may be verified and shared by the USDA as described in the Privacy Act and Use and Disclosure statement.

- SNAP training materials are available on request from the Food and Nutrition Service. Owners/Officers must ensure that the training materials are reviewed by all firm's owners and all employees (whether paid or unpaid, new, full-time, or part-time), and that all employees will follow SNAP regulations.

- Violations of program rules can result in administrative actions such as fines, sanctions, withdrawal or disqualification from the Supplemental Nutrition Assistance Program; Violations of the Supplemental Nutrition Assistance Program rules can also result in federal, state and/or local criminal prosecution and sanctions.

- Owners/officers are responsible for violations of the Supplemental Nutrition Assistance Program regulations, including those committed by any of the firm's employees (paid or unpaid, new, full-time, or part-time). These include violations such as, but not limited to:

    - Trading cash for Supplemental Nutrition Assistance Program benefits (i.e. trafficking);

    - Accepting Supplemental Nutrition Assistance Program benefits as payment for ineligible items;

    - Accepting Supplemental Nutrition Assistance Program benefits as payment on credit accounts or loans;

    - Knowingly accepting Supplemental Nutrition Assistance Program benefits from people not authorized to use them;

- Disqualification from the WIC Program may result in Supplemental Nutrition Assistance Program disqualification, and a disqualification from the Supplemental Nutrition Assistance Program may result in WIC Program disqualification;

- In accordance with federal law and U.S. Department of Agriculture policy, no customer may be discriminated against on the grounds of race, color, national origin, sex, age, religion, political beliefs, or disability. SNAP customers must be treated in the same manner as non-Supplemental Nutrition Assistance Program customers;

- Participation can be denied or withdrawn if my firm violates any laws or regulations issued by federal, state or local agencies, including civil rights laws and their implementing regulations;

- Changes in the firm's ownership, address, type of business, and operation must be reported to the Food and Nutrition Service.

- If your store is disqualified or fined for violating Program rules, FNS may publicly disclose your store's name and address, owners' names, and the penalty.

Supplemental Nutrition Assistance Program authorization may not be transferred to new owners, partners, or corporations. An unauthorized individual or firm accepting or redeeming Supplemental Nutrition Assistance Program benefits is subject to substantial fines and administrative sanctions.

> **PENALTY WARNING STATEMENT** - The Food and Nutrition Service can deny or withdraw your approval to accept Supplemental Nutrition Assistance Program benefits if you provide false information or fail to disclose required/requested information. In addition, if false information is provided or information is hidden from the Food and Nutrition Service, the owners of the firm may be liable for a $10,000 fine or imprisoned for as long as five years, or both (7 U.S.C. 2024(f) and 18 U.S.C. 1001).

I have read, understand, and agree with the conditions of participation outlined in the Privacy Act, Use and Disclosure, Penalty Warning and Certification Statements, and agree to comply with all statutory and regulatory requirements associated with participation in the Supplemental Nutrition Assistance Program.

x _____          x _Antonio Bonheur_
Signature                            Print Name

_05/10/21_                           _Owner_
Date Signed                          Print Title

31.    On February 24, 2025, BONHEUR submitted an application for Reauthorization for JVS to redeem SNAP benefits.

      a.   In section 11 of the application, BONHEUR stated that JVS had approximately $152,000 in total retail sales for 2023.

      b.   In section 12 of the application, BONHEUR listed himself as the only owner and officer of JVS.

       c.   In section 13a of the application, BONHEUR indicated that no officer, owner, partner, and/or member was currently receiving assistance through SNAP.

32.    This statement in section 13a was in fact false, as BONHEUR had been receiving SNAP Benefits and redeeming them since 2022.

### C.    BONHEUR SNAP Application and Benefits Received

33.    Investigators queried the Massachusetts Department of Transitional Assistance and determined that BONHEUR himself was receiving SNAP Benefits, despite owning a business, and that business itself conducting millions of dollars in SNAP redemptions in the past calendar years.

34.    On September 14, 2022, BONHEUR submitted an application to receive SNAP benefits for himself. In the application, BONHEUR stated that there was one person living in his household, and that "no one" in his house received "any income or benefits." BONHEUR claimed that he paid $1,350 in household rent.  BONHEUR further answered the following questions in the affirmative: "Does your income and money in the bank add up to less than your monthly housing expenses?", "Is your monthly income less than $150 and is your money in the bank $100 or less?".

**Emergency SNAP benefits**

| | |
|---|---|
| Does your income and money in the bank add up to less than your monthly housing expenses? | Yes |
| Is your monthly income less than $150 and is your money in the bank $100 or less? | Yes |
| Are you a migrant worker and is your money in the bank $100 or less? | No |

35.    The SNAP Benefit Application included a warning of Penalties and rules:

**SNAP Penalty Warning**

I understand that if I or any member of my SNAP household intentionally breaks any of the rules listed below, that person will not be eligible for SNAP for one year after the first violation, two years after the second violation and forever after the third violation. That person may also be fined up to $250,000, imprisoned up to 20 years or both. S/he may also be subject to prosecution under other applicable Federal and State laws. These rules are:

- Do not give false information or hide information to get SNAP benefits.
- Do not trade or sell SNAP benefits.
- Do not alter EBT cards to get SNAP benefits you are not eligible to get.
- Do not use SNAP benefits to buy ineligible items, such as alcoholic drinks and tobacco.
- Do not use someone else's SNAP benefits or EBT card, unless you are an authorized representative.

I also understand the following penalties:

- Individuals who commit a cash program Intentional Program Violation (IPV) will be ineligible for SNAP for the same period the individual is ineligible from cash assistance.
- Individuals who make a fraudulent statement about their identity or residency to get multiple SNAP benefits at the same time will be ineligible for SNAP for ten years.
- Individuals who trade (buy or sell) SNAP benefits for a controlled substance/illegal drug(s), will be ineligible for SNAP for two years for the first finding, and forever for the second finding.
- Individuals who trade (buy or sell) SNAP benefits for firearms, ammunition or explosives, will be ineligible for SNAP forever.
- Individuals who trade (buy or sell) SNAP benefits having a value of $500 or more, will be ineligible for SNAP forever.
- The State may pursue an IPV against an individual who makes an offer to sell SNAP benefits or an EBT card online or in person.
- Individuals who are fleeing to avoid prosecution, custody or confinement after conviction for a felony, or are violating probation or parole, are ineligible for SNAP.
- Paying for food purchased on credit is not allowed and can result in disqualification from SNAP.
- Individuals may not buy products with SNAP benefits with the intent to discard the contents and return containers for cash.
- DTA may also share the names and contact information of SNAP recipients with SNAP Path to Work providers for recruitment purposes. I understand that members of my household may be contacted by DTA SNAP Path to Work specialists or contracted providers to explore SNAP Path to Work participation options. For more information about the SNAP Path to Work program, visit www.snappathtowork.org.

36.    BONHEUR submitted information under the penalties of perjury that no one else lived in his house and that he had received no income other than his social security check. BONHEUR listed his own income as $0.00 with the exception that he did report his social security income which he is believed to lawfully receive based in part on his age.

**Income**
**Does anyone have Earned Income?** No

**Does anyone have Other Income?** Yes

| Name | Other Income | Type | Business Expenses |
|---|---|---|---|
| Antonio Bonheur | Yes | RSDI | No |

**Has anyone received a Lump Sum?** No

**Does anyone have Garnishments?** No

**Expenses**
**Does anyone have Housing Expenses?** Yes

| Name | Type | Amount | Frequency |
|---|---|---|---|
| Antonio Bonheur | Rent | $1,350.00 | Monthly |

**Does anyone have Utility Expenses?** Yes

| Name | Type |
|---|---|
| Antonio Bonheur | SUA: Non Heating Utility |

**Does anyone have Support Expenses?** No

**Does anyone have Dependent Care Expenses?** No

**Does anyone have Medical Expenses?** No

**Does anyone have Health Insurance?** Yes

| Name | Insurer |
|---|---|
| Antonio Bonheur | Federal Government |
| Antonio Bonheur | Federal Government |

37.    BONHEUR certified that he had read the rules of the program which include "do not trade or sell SNAP benefits". BONHEUR also certified that he was aware of a variety of other rules concerning the SNAP program, including that SNAP benefits were not eligible to buy certain items such as Tabacco products, drugs or alcohol. BONHEUR certified that he knew that violations of these laws and terms could result in Federal and/or State prosecutions.

38.    Between 2022 and present, BONHEUR received a total of approximately $10,821.66 in SNAP benefits, averaging to $338 per month. For BONHEUR's SNAP benefits, every single transaction in the year 2025 was conducted at JVS.

39.     Based on the income he received and ownership of JVS that was redeeming hundreds of thousands of dollars in SNAP benefits, BONHEUR would not have qualified for SNAP benefits if his true income information were disclosed in his application.  I believe that Massachusetts Department of Transitional Assistance apparently did not compare the income BONHEUR actually received from JVS to the income, which he certified he received "$0.00" on his application. During the period of BONHEUR receiving SNAP benefits, investigators located dozens of instances where BONHEUR redeemed SNAP Benefits at JVS, the store he owned.

## II.     INVESTIGATION OF JVS

40.     Investigators conducted a check of USDA records and databases and discovered that JVS had an exceptionally large and anomalous Average Monthly Redemption (AMR) rate for EBT transactions for a business of that size, type, and geographical location.  Based on my training and experience in working these types of investigations, the level of transaction activity demonstrates that JVS facilitated illegal redemption of SNAP Benefits and that such illegal transactions comprised the great majority of its SNAP redemption activity.

## A.     HISTORY OF SNAP REDEMPTIONS

41.     Investigators queried the data related to historical SNAP Benefits redeemed at JVS. The following table lists the redemption activity of JVS for the months of September 2021 through October 2025.

| Month | Total $ Value of SNAP Redemptions | Total # Of SNAP Transactions | Average $ Amount Per SNAP Transaction | # Of SNAP Transactions At or Over $95 | Total $ Value of SNAP Transactions At or Over $95 |
|---|---|---|---|---|---|
| Sep-21 | $872 | 12 | $73 | 4 | $529 |
| Oct-21 | $2,618 | 18 | $145 | 10 | $2,267 |
| Nov-21 | $2,719 | 22 | $124 | 9 | $2,215 |
| Dec-21 | $2,116 | 16 | $132 | 8 | $1,837 |
| Jan-22 | $2,210 | 19 | $116 | 11 | $1,947 |
| Feb-22 | $2,056 | 15 | $137 | 6 | $1,649 |
| Mar-22 | $3,624 | 27 | $134 | 14 | $3,332 |
| Apr-22 | $3,484 | 25 | $140 | 9 | $2,956 |

| May-22 | $4,147 | 29 | $143 | 20 | $3,835 |
| Jun-22 | $4,114 | 43 | $96 | 16 | $3,212 |
| Jul-22 | $4,755 | 47 | $101 | 23 | $4,146 |
| Aug-22 | $5,837 | 55 | $106 | 24 | $5,324 |
| Sep-22 | $4,494 | 31 | $145 | 21 | $4,157 |
| Oct-22 | $6,981 | 55 | $127 | 24 | $6,094 |
| Nov-22 | $7,162 | 51 | $140 | 26 | $6,508 |
| Dec-22 | $9,742 | 48 | $203 | 23 | $8,644 |
| Jan-23 | $7,207 | 56 | $129 | 25 | $6,063 |
| Feb-23 | $8,135 | 50 | $163 | 29 | $7,633 |
| Mar-23 | $11,161 | 66 | $169 | 30 | $10,080 |
| Apr-23 | $6,466 | 53 | $122 | 21 | $5,623 |
| May-23 | $7,144 | 51 | $140 | 22 | $6,249 |
| Jun-23 | $7,583 | 53 | $143 | 24 | $6,970 |
| Jul-23 | $8,774 | 56 | $157 | 34 | $8,113 |
| Aug-23 | $8,113 | 51 | $159 | 31 | $7,515 |
| Sep-23 | $7,948 | 46 | $173 | 29 | $7,514 |
| Oct-23 | $6,467 | 35 | $185 | 26 | $6,085 |
| Nov-23 | $17,416 | 90 | $194 | 68 | $16,829 |
| Dec-23 | $36,372 | 175 | $208 | 139 | $35,328 |
| Jan-24 | $60,796 | 289 | $210 | 245 | $59,328 |
| Feb-24 | $92,568 | 439 | $211 | 362 | $89,695 |
| Mar-24 | $157,937 | 673 | $235 | 553 | $154,214 |
| Apr-24 | $243,963 | 924 | $264 | 787 | $239,222 |
| May-24 | $315,464 | 1180 | $267 | 976 | $307,533 |
| Jun-24 | $360,461 | 1308 | $276 | 1118 | $353,651 |
| Jul-24 | $387,665 | 1537 | $252 | 1261 | $377,512 |
| Aug-24 | $540,870 | 1943 | $278 | 1663 | $529,439 |
| Sep-24 | $501,004 | 1882 | $266 | 1623 | $488,993 |
| Oct-24 | $399,351 | 1559 | $256 | 1357 | $391,857 |
| Nov-24 | $348,563 | 1412 | $247 | 1246 | $343,913 |
| Dec-24 | $245,437 | 984 | $249 | 821 | $241,608 |
| Jan-25 | $202,394 | 742 | $272 | 541 | $197,731 |
| Feb-25 | $233,072 | 823 | $283 | 663 | $229,240 |
| Mar-25 | $231,022 | 761 | $303 | 636 | $227,929 |
| Apr-25 | $241,904 | 758 | $319 | 679 | $239,242 |
| May-25 | $250,511 | 827 | $302 | 723 | $248,897 |
| Jun-25 | $267,210 | 877 | $304 | 761 | $263,962 |
| Jul-25 | $328,338 | 1064 | $308 | 948 | $323,982 |
| Aug-25 | $335,728 | 1060 | $316 | 948 | $331,958 |
| Sep-25 | $313,833 | 1019 | $307 | 901 | $309,621 |
| Oct-25 | $358,472 | 1135 | $315 | 1012 | $354,179 |
| Nov-25 | $300,100 | 941 | $319 | 861 | $297,169 |
| | | | | | |
| **TOTAL** | **$6,916,380** | | | | **$6,783,529** |

42.     Based upon the observations documented during this 2025 store visit and prior visits conducted in 2024 and 2023, I believe it would be extremely difficult to purchase over $95 worth of SNAP eligible from JVS in a single transaction. As an initial matter, JVS is a very small

store barely exceeding the size of a closet and maintains a very limited inventory of SNAP eligible food items. Furthermore, even if $95 worth of SNAP eligible items were located, it would be difficult to carry those items, as there are no hand baskets or carriages. Furthermore, the checkout area is virtually nonexistent and there is no means for a customer to separate their items and present them for purchase.

43.    While an individual transaction for more than $95 would prove difficult to accomplished, based on my training and experience and the documented observations of the JVS store, there is simply no means by which over $100,000 in SNAP eligible foods could be purchased at JVS in a month.  Such volume would require over $3,000 in SNAP eligible food to be purchased everyday for thirty (30) days. In fact, the monthly volume of SNAP redemptions were far beyond $100,000 and for many months, exceeded $300,000.

44.    Furthermore, there is no means by which hundreds of thousands of dollars in SNAP eligible foods are transacted in those individual transactions over $95. Given the available inventory and storage space in the approximate 150 square feet, and the presence of numerous items that are not eligible to be purchased with SNAP benefits, this level of legitimate transaction activity and volume simply is not possible at JVS.  Comparisons of the transaction activity at JVS to the transaction activity at other stores that accept SNAP confirms this understanding.

B.    COMPARISONS TO AVERAGE REDEMPTIONS

45.    Typically, supermarkets are the only type of stores that have numerous legitimate SNAP transactions in excess of $100. By comparison, small and medium grocery stores offer only a limited number of food stamp eligible items and do not have sufficient inventory or amenities to allow customers to acquire large amounts of groceries within the location during a single transaction.  Specifically, stores conducting SNAP transactions over $100 generally must have

large areas of shelf space, a large point of sale checkout area, and carriages for the customers. Further, in my experience, an increasing number of SNAP transactions of $100 or more is often indicative of a store engaging in food stamp fraud.

46.     Understanding these commonsense principals, and considering the circumstances, inventory, and size of JVS, the transaction activity, amount and volume for JVS was compared to other grocery stores. For example, JVS was listed as a "Medium Grocery Store." This is a designation USDA uses to identify the type of food sold and the size of the store. Investigators queried comparable "medium grocery stores" from September 2021 through October 2025, in order to determine what percentage of their SNAP transactions fell within the dollar amount thresholds.    These comparable Medium Grocery Stores were located in the exact same geographical region and Zip Code as JVS. The average square footage of comparative stores in the same zip code of JVS was 1935 square feet.    The smallest comparative store to JVS had approximately 1728 square feet of retail space, which is approximate 12 times larger than JVS (JVS is only about 150 square feet in size). The comparable stores also had substantially more products and inventory than JVS, including numerous refrigeration units, for the sale of cold items like meat, produce, and beverages.

47.     The Average Monthly Redemption (AMR) – meaning the average total amount of SNAP benefits redeemed -- for those comparable medium grocery stores was approximately $16,269.00 as of September 2025. By comparison, The AMR for JVS was approximately $298,380.00 with numerous months exceeding $300,000 in SNAP redemptions. As of September 6, 2025, JVS has redeemed a total of approximately $6,024,613.67 in SNAP EBT transactions at its store since it was eligible to redeem SNAP benefits in 2021.

48.    The comparison data also revealed that for other medium grocery stores in the area, on average 90% of all their SNAP transactions were for amounts less than $40, and that SNAP transactions for amounts over $95 accounted for approximately 1.48% of the transaction volume. For that approximate four-year period, on average a "medium grocery store" would have only 9% of its SNAP transaction were for more than $40, and less than one percent of its SNAP transactions were for more than $150. Similarly, during that five-year period on average, medium grocery stores redeemed approximately $640,000 worth of SNAP benefits in transactions over $40, and $140,000 worth of SNAP benefits in transactions over $150. A table explaining these figures follows:

| Date Range of 9-1-21 to 10-13-25 All Comparable Stores | | |
| --- | --- | --- |
| # of Transactions of All Comparison Stores | Amount | Percent |
| 76802 | <$40.00 | 90.82% |
| 2859 | $40.01 - $55.00 | 3.38% |
| 2058 | $55.01 - $75.00 | 2.43% |
| 1039 | $75.01 - $95.00 | 1.23% |
| 1257 | $95.01 - $150.00 | 1.48% |
| 480 | $150.01 - $250.00 | 0.58% |
| 102 | $250.00 - $350.00 | 0.12% |
| 48 | $350.00 - $713.94 | 0.06% |
| 0 | >713.95 | 0.00% |
| | | |
| **Average Total Dollar Transactions over $40.00** | **$642,004.89** | **9.28%** |
| **Average Total Dollar Transactions over $150** | **$140,978.75** | **0.76%** |

49.    For JVS, however, only 10% of its SNAP transactions were for amounts less than $40, and SNAP transactions for amounts over $95 accounted for approximately 90% of the transaction volume. More than 70% of the SNAP transactions at JVS were for more than $150. Similarly, during that five-year period on average, JVS redeemed approximately $6,438,000 worth

of SNAP benefits in transactions over $40, and $5,954,440 worth of SNAP benefits in transactions

over $150. A table explaining these figures follows:

| Date Range of 9-1-21 to 10-13-25 Jesula Variety Store | | |
|---|---|---|
| **# of Transactions at Jesula** | **Amount** | **Percent** |
| 2414 | <$40.00 | 10.05% |
| 462 | $40.01 - $55.00 | 1.93% |
| 756 | $55.01 - $75.00 | 3.15% |
| 247 | $75.01 - $95.00 | 1.03% |
| 3249 | $95.01 - $150.00 | 13.53% |
| 6986 | $150.01 - $250.00 | 29.09% |
| 3465 | $250.00 - $350.00 | 14.43% |
| 5543 | $350.00 - $713.94 | 23.10% |
| 885 | >713.95 | 3.69% |
| | | |
| **Jesula Variety Store Dollar Transactions over $40** | **$6,438,068.72** | **89.94%** |
| **Jesula Variety Store Dollar Transactions over $150** | **$5,954,440.90** | **70.30%** |

## C.    POLE CAM SURVEILLANCE

50.    Investigators conducted surveillance at 1549 Blue Hill Ave, Mattapan, MA 02126

and found that repeatedly large transactions were occurring at JVS and people were leaving the

stores sometimes with no merchandise or bags visible at all even after spending hundreds of dollars

in SNAP EBT transactions.

51.    For instance, investigators reviewed pole camera footage of the store's entrance

from May 6, 2025, for every transaction that day at JVS. Not a single one of these transactions

taking place on May 6, 2025, resulted in anyone being seen leaving the store with groceries or

bags commensurate with a food purchase in the hundreds of dollars.  A few customers were seen

departing with 1 small plastic store bag in their hand. The following is a list of the transactions

observed by investigators that day at JVS that exceeded $100.

25

| DATE / TIME | TRANSACTION AMOUNT |
|---|---|
| 05/06/2025 10:30:55 AM | $375.00 |
| 05/06/2025 11:02:23 AM | $531.00 |
| 05/06/2025 11:05:45 AM | $188.00 |
| 05/06/2025 11:07:42 AM | $240.00 |
| 05/06/2025 12:30:47 PM | $300.60 |
| 05/06/2025 12:38:54 PM | $642.00 |
| 05/06/2025 12:59:46 PM | $456.00 |
| 05/06/2025 01:02:01 PM | $124.00 |
| 05/06/2025 01:18:20 PM | $255.00 |
| 05/06/2025 02:28:54 PM | $390.00 |
| 05/06/2025 03:40:14 PM | $749.10 |
| 05/06/2025 03:41:26 PM | $126.50 |
| 05/06/2025 03:45:02 PM | $631.00 |
| 05/06/2025 03:48:08 PM | $250.00 |
| 05/06/2025 04:52:58 PM | $382.00 |
| 05/06/2025 05:39:26 PM | $220.00 |
| 05/06/2025 06:13:05 PM | $640.00 |
| 05/06/2025 06:19:38 PM | $249.00 |

52.    Your affiant reviewed pole camera footage of the store's entrance from May 28, 2025, for all transactions over $100.00 that day at JVS. Again, not a single one of these transactions resulted in anyone being seen leaving the store with groceries or bags commensurate with a food purchase in the hundreds of dollars The following is a list of the transactions observed by investigators that day at JVS that exceeded $100.:

| DATE / TIME | TRANSACTION AMOUNT |
|---|---|
| 05/28/2025 11:49:22 AM | $480.00 |
| 05/28/2025 01:45:01 PM | $120.00 |
| 05/28/2025 02:04:33 PM | $378.00 |
| 05/28/2025 04:21:09 PM | $400.00 |
| 05/28/2025 04:43:24 PM | $270.00 |
| 05/28/2025 05:02:48 PM | $270.00 |

## III.    SAUL MACHE MIXE STORE

53.    SAUL ALISME signed an application for SMMS to be a SNAP Authorized retailer on February 14, 2025.  SMMS began accepting SNAP Benefits on or about May 2025.

54.     Over the course of the investigation, investigators have become familiar with SMMS. Based upon the investigation of SMMS including my investigation of the documents reporting the physical premises of 1549 Blue Hill Avenue, and multiple instances where purchases have been made from SMMS, I know that the actual footprint of SMMS is comprised of approximately 500 square feet of space.

55.     This retail area at SMMS includes about two or three feet of checkout space near the point-of-sale terminal. There is one register, one point of sale terminal, and no optical scanners to scan items for purchase.  There is one row of shelving flanking an open interior area, where inventory can be obtained by customers. There are no visible carriages and no handbaskets, and very few items for sale that are eligible to be purchased with SNAP Benefits.

**A.      STORE VISIT**

56.     As part of the program for stores to redeem SNAP Benefits, stores that accept SNAP Benefits are subject to store visits by FNS personnel and contractors employed by FNS. The purpose of these store visits is to document the nature, size and operations of the store and identify the nature and amount of SNAP Benefit eligible food available in the store.  FNS conducted store visits to SMMS in April 2025.

57.     On April 12, 2025, members of USDA FNS conducted a store visit at SMMS and documented the retail space, inventory, and fixtures. ALISME was present during the visit and consented to the store review. USDA FNS agents also photographed the premises. The visit documented the following:

> a.   There was 1 checkout area, 1 cash register, 1 point of sale device, and no optical scanners used to scan bar codes were observed;
>
> b.   No shopping baskets or shopping carts were observed;

c. No meats or seafoods were observed for sale;











58.     SMMS appears to stock a single shelving unit of packaged food items, including pastas, condiments, and flour. Investigators know from the undercover transactions taking place that SMMS continues to have a freezer and a refrigerator.  A second shelving unit situated against the refrigerator appears to be stocked primarily with chips.  SMMS appears to stock small quantities of refrigerated beverages, including sodas, juices, sports drinks and some single-serving dairy items. SMMS does not appear to stock cheese, larger-size milk or creamers, eggs or other diary items.  SMMS stocks very few packaged food items that are SNAP eligible.

**B.     FNS DOCUMENTS**

59.     I have reviewed the FNS documents for SMMS.  SAUL ALISME submitted one application to FNS for SMMS to accept SNAP benefits. The application was submitted in February 2025.

60.     The first application for SMMS to redeem SNAP benefits was submitted on February 17, 2025, by SAUL ALISME.  ALISME identified the address of SMMS as 1549 Blue Hill Avenue, Mattapan, MA, and identified himself as the owner of the store.

    a.  ALISME stated that SMMS opened for business under his ownership in December 2024.

    b.  In section 19 of the application, ALISME entered that he had: three varieties of Breads and/or Cereals staple food category; three varieties of the Dairy products staple food category; three varieties of the Meat, Poultry, and/or Fish staple food category; and three varieties of the Vegetables and/or Fruits staple food category.

    c.  In the application, ALISME stated that his estimated yearly retail sales were $200,000. ALISME stated that there was 1 cash register in the store and that optical scanners are not used.

    d.  In the Certification and Signature section, ALISME confirmed his understanding of an agreement with the following:

        i.  Violations of program rules can result in administrative actions such as fines, sanctions, withdrawal or disqualification from the Supplemental Nutrition Assistance Program; Violations or the Supplemental Nutrition Assistance program rules can also result In federal, state and/or local criminal prosecution and sanctions.

       ii.  Owners/officers are responsible for violations or the Supplemental Nutrition Assistance Program regulations, Including those committed by any of the firm's employees, firm's employees (paid or unpaid, new, full-time, or part-time). These Include violations such as, but not limited to:

          1.  Trading cash for Supplemental Nutrition Assistance Program benefits (I.e. trafficking);
          2.  Accepting Supplemental Nutrition Assistance Program benefits as payment for ineligible items;
          3.  Accepting Supplemental Nutrition Assistance Program benefits as payment on credit accounts or loans;
          4.  Knowingly accepting Supplemental Nutrition Assistance Program benefits from people not authorized to use them;

61.    The signed Certification and Signature section of the February 2025 FNS application for SMMS follows, with one digital signature from February 14, 2025, and one hand signature on February 17, 2025.

**CERTIFICATION AND SIGNATURE** - By signing below, you are confirming your understanding of and agreement with the following:

- I am an owner of this firm;
- I have provided truthful and complete information on this form and on any documents provided to the Food and Nutrition Service;
- If I provide false information, my application may be denied or withdrawn;
- Any information I have provided or will provide may be verified and shared by the USDA as described in the Privacy Act and Use and Disclosure statement;
- By my signature below, I release my tax records to the Food and Nutrition Service;
- I will receive Supplemental Nutrition Assistance Program training materials upon authorization. It is my responsibility to ensure that the training materials are reviewed by all firm's owners and all employees (whether paid or unpaid, new, full-time or part-time), and that all employees will follow Supplemental Nutrition Assistance Program regulations. If I do not receive these materials I must contact the Food and Nutrition Service to request them;
- I am aware that violations of program rules can result in administrative actions such as fines, sanctions, withdrawal or disqualification from the Supplemental Nutrition Assistance Program; I am aware that violations of the Supplemental Nutrition Assistance Program rules can also result in federal, state and/or local criminal prosecution and sanctions;
- I accept responsibility on behalf of the firm for violations of the Supplemental Nutrition Assistance Program regulations, including those committed by any of the firm's employees, paid or unpaid, new, full-time or part-time. These include violations such as, but not limited to:
  - Trading cash for Supplemental Nutrition Assistance Program benefits (i.e. trafficking);
  - Accepting Supplemental Nutrition Assistance Program benefits as payment for ineligible items;
  - Accepting Supplemental Nutrition Assistance Program benefits as payment on credit accounts or loans;
  - Knowingly accepting Supplemental Nutrition Assistance Program benefits from people not authorized to use them;
- Disqualification from the WIC Program may result in Supplemental Nutrition Assistance Program disqualification, and a disqualification from the Supplemental Nutrition Assistance Program may result in WIC Program disqualification;
- In accordance with federal law and U.S. Department of Agriculture policy, no customer may be discriminated against on the grounds of race, color, national origin, sex, age, religion, political beliefs, or disability. Supplemental Nutrition Assistance Program customers must be treated in the same manner as non-Supplemental Nutrition Assistance Program customers;
- Participation can be denied or withdrawn if my firm violates any laws or regulations issued by federal, state or local agencies, including civil rights laws and their implementing regulations;
- I am responsible for reporting changes in the firm's ownership, address, type of business and operation to the Food and Nutrition Service.
- If your store is disqualified or fined for violating Program rules, FNS may publicly disclose your store's name and address, owners' names, and the penalty.

Supplemental Nutrition Assistance Program authorization may not be transferred to new owners, partners, or corporations. An unauthorized individual or firm accepting or redeeming Supplemental Nutrition Assistance Program benefits is subject to substantial fines and administrative sanctions.

---

**PENALTY WARNING STATEMENT** - The Food and Nutrition Service can deny or withdraw your approval to accept Supplemental Nutrition Assistance Program benefits if you provide false information or try to hide information we ask you to give us. In addition, if false information is provided or information is hidden from the Food and Nutrition Service, the owners of the firm may be liable for a $10,000 fine or imprisoned for as long as five years, or both (7 U.S.C. 2024(f) and 18 U.S.C. 1001).

---

I have read, understand, and agree with the conditions of participation outlined in the Privacy Act, Use and Disclosure, Penalty Warning and Certification Statements, and agree to comply with all statutory and regulatory requirements associated with participation in the Supplemental Nutrition Assistance Program.

| X | Saul Alisme | X | Saul Alisme |
|---|---|---|---|
| | Signature | | Printed Name |
| | 02/14/2025 | | Owner |
| | Date Signed | | Print Title |

Fri Feb 14 15:43:01 CST 2025



## IV.    INVESTIGATION OF SMMS

### A.    HISTORY OF SNAP REDEMPTIONS

62.    Investigators queried the data related to historical SNAP Benefits redeemed at SMMS.  The following table lists the redemption activity of SMMS for the months of May 2025 through October 2025.

| Month | Total $ Value of SNAP Redemptions | Total # Of SNAP Transactions | Average $ Amount Per SNAP Transaction | # Of SNAP Transactions At or Over $95 | Total $ Value of SNAP Transactions At or Over $95 |
|---|---|---|---|---|---|

| May-25 | $699 | 20 | $34 | 2 | $201 |
|---|---|---|---|---|---|
| Jun-25 | $12,841 | 141 | $91 | 41 | $10,185 |
| Jul-25 | $6,635 | 87 | $76 | 24 | $4,975 |
| Aug-25 | $8,097 | 87 | $93 | 25 | $6,502 |
| Sep-25 | $21,760 | 167 | $130 | 71 | $19,289 |
| Oct-25 | $35,590 | 211 | $168 | 105 | $32,972 |
| Nov-25 | $50,890 | 293 | $174 | 170 | $47,766 |
|  |  |  |  |  |  |
| **TOTAL** | **$136,512.00** |  |  |  | **$121,890.00** |

## V.     UNDERCOVER OPERATIONS AT JVS AND SMMS

63.     Investigators conducted undercover operations at 1549 Blue Hill Avenue to see if the stores at this location were trafficking SNAP benefits in exchange for cash. Those undercover transactions took place at both JVS and SMMS. The undercover officer was equipped with a recording device that captured the transaction.   Between June and October of 2025, the UC conducted numerous SNAP EBT transactions using a USDA-OIG issued Undercover (UC) EBT card with SNAP benefits issued on it.

64.     During these undercover operations it was observed that there was a surveillance video recording system at the building in both the hallway and inside the store of JVS. As noted above, the surveillance system appears to be monitored from within JVS through a monitor that displays the camera footage.

65.     The UC trafficked SNAP Benefits in exchange for cash at JVS on 4 separate occasions.   In three of the operations, BONHEUR was working as the cashier and exchanged benefits for cash himself as seen in the attached photographs below. All of the UC SNAP Trafficking transactions were audio and video recorded.

66.     The UC trafficked SNAP Benefits in exchange for cash at SMMS on 2 separate occasions. In both of the operations, ALISME was working as the cashier and exchanged benefits for cash himself as seen in the attached photographs below. All of the UC SNAP Trafficking transactions were audio and video recorded.

**A.    JUNE 11, 2025, UNDERCOVER SNAP TRANSACTION AT SMMS**

67.    On June 11, 2025, the UC entered SMMS and purchased 1 bag of rice for $25 and 1 bag of cornmeal for $10. The UC also trafficked $120 in USDA EBT SNAP Benefits in exchange for $100.00 in cash comprised of five $20 bills. ALISME processed the total transaction for an amount of $155.00.

68.    Still images from the undercover recording follow, depicting the interior of the room containing JVS, and ALISME conducting the SNAP Benefit trafficking transaction:



69.    Photographs depicting the receipt and items purchased during the transaction follow:



## B.    JUNE 24, 2025, UNDERCOVER SNAP TRANSACTION AT JVS

70.    On June 24, 2025, the UC entered JVS and purchased one bag of "Peyi" for approximately $15.00, one container of Tumeric for approximately $15.00 and two bottles of homemade "Island Rum Cream" a "liquor" for approximately $31.05 each. These bottles of liquor had no labels or markings. The total purchase price for these items was $92.10. The alcohol items were ineligible to be purchased with SNAP benefits. UC discovered that Jesula Variety Store co-located in the same vicinity as a woman's hair salon (1 door down). During the deal an older woman in JVS requested the assistance of one of the women working in the salon area to help run the EBT machine for the transaction.

71.    On the UC recording, a video surveillance camera can be observed capturing the hallway of 1549 Blue Hill Avenue.

72.    Still images from the undercover recording follow, depicting the interior of the room containing JVS:



73.    Photographs depicting the receipt and items purchased during the transaction follow:



## C.    JULY 2, 2025, UNDERCOVER SNAP TRANSACTION AT JVS

74.    On July 2, 2025, the UC entered JVS and observed there was a long line of customers in the store. BONHEUR was observed in JVS, but he did not appear to be conducting the register transactions. After waiting for the customers ahead of the UC to complete their transactions, the UC entered the store and purchased one bag of "Peyi" for approximately $16, one bag of cornmeal for approximately $10.00. UC also exchanged $121.00 in UC EBT SNAP Benefits for $100.00 in cash, receiving (1) $100.00 bill. A male clerk with dreadlocks conducted the transaction for the UC for $147 in EBT SNAP Benefits.  It appears from the recording that the male clerk reached into a black plastic bag hanging above the cash register to retrieve the currency that was provided to the UC.

75.    While waiting in line, the UC observed a female in a white and blue exit JVS after making a transaction. The female was observed outside of JVS carrying one small bag or purse and entering into a vehicle. A review of the SNAP transaction data for JVS at the time showed that this woman conducted a $429 SNAP transaction and was observed receiving essentially no SNAP eligible food in exchange

76.    Still images from the undercover surveillance video follow:





77.    Photographs of the receipt and items obtained during this transaction follow:



78. During this transaction, investigators observed that JVS has a surveillance system, the display for which is located next to the checkout area and point of sale terminal on the counter. A still image depicting the black plastic bag containing the cash used to payout the UC and the display for the JVS surveillance system follows, with at least two cameras active and on display:



**D.    JULY 24, 2025, UNDERCOVER SNAP TRANSACTION AT JVS**

79.    On July 24, 2025, the UC entered JVS and Purchased 1 bag of cornmeal, 1 bag of "MannaPack" Rice, and 1 bottle of "Powermalt Extra Energy Drink" for approximately $20. UC also exchanged $124.00 in EBT SNAP Benefits for $100.00 in cash (5) $20.00 bills. BONHEUR conducted the transaction with the UC. UC then exited the store.

80.    Still images from the undercover recording follow, depicting BONHEUR conducting the transaction:



81.    Photographs of the receipt and items obtained during this transaction follow:





82.      Investigators know that MannaPacks are manufactured by a nonprofit called Feed

My Starving Children. MannaPacks are donated food products and are never to be sold in the

United States and are never to be for sale anywhere. These packages are prepared and shipped to

food insecure countries (such as Haiti) directly from the manufacture point where the product is

sealed into shipping containers. The product is then shipped and to be given to children in need of

emergency sustenance. The packages are paid for exclusively from donations. In order for these

to be for sale in the United States, the items would have to be illicitly obtained from the donated

food supply chain of one of the receiving countries and then the packages would have to be

transported back to the United States where a vendor such as JVS could then obtain them and place

them on the shelves for sale.

## E.      AUGUST 28, 2025, UNDERCOVER SNAP TRANSACTION AT JVS

83.      On August 28, 2025, UC entered JVS and purchased 1 bag of cornmeal and 1 bag

containing some type of dry grain for a total of $25.00 EBT SNAP Benefits. UC also exchanged

$115.00 in EBT SNAP Benefits for $100.00 in cash (1) $100.00 Bill. BONHEUR conducted the

transaction with the UC for $140 in EBT SNAP Benefits. The UC then exited the store.

84.    Still images from the undercover recording follow, depicting BONHEUR conducting the transaction:



85.    Photographs of the receipt and items obtained during this transaction follow:



**F.      OCTOBER 16, 2025, UNDERCOVER SNAP TRANSACTION AT SMMS**

86.      On October 16, 2025, UC entered SMMS and purchased 3 MannaPacks for $25 and a bag of flour for $10.00. Lastly, the UC trafficked $120.55 in USDA EBT SNAP benefits in exchange for $100.00 in cash comprised of one $100 bill. ALISME processed the transaction for an amount of $155.55.

87.      Still images from the undercover recording follow, depicting ALISME conducting the transaction:



88.      The transaction receipt and pictures of the purchased items and bills received follow:



### G.    OCTOBER 22, 2025, UNDERCOVER SNAP TRANSACTION AT JVS

89.    On October 22, 2025, the UC entered JVS and purchased 3 MannaPacks, 1 Malt Alcoholic Beverage and 1 bag of corn meal for $43.00. Lastly, UC trafficked $140.00 in USDA EBT SNAP benefits in exchange for $100.00 in cash in two $50 bills. BONHEUR processed the transaction for an amount of $183.00 in EBT SNAP Benefits. The UC then exited the store.

90.    Still images from the undercover recording follow, depicting BONHEUR conducting the transaction:



91.     The transaction receipt and pictures of the purchased items and bills received

follow:





92.    Prior to the UC conducting the UC transaction, the UC observed another SNAP

Benefit trafficking transaction take place.  The recording reveals a male presented an EBT SNAP

Benefits card to BONHEUR. BONHEUR conducted a transaction on the point of sale terminal

and provided the customer with an amount of cash and a small bag of items. Investigators checked

the store's transactional data and identified the transaction that was processed during the observed

trafficking transaction, which was associated with an EBT card number ending in 7291 and was

assigned to a female living in Fall River. This observed SNAP Trafficking transaction took place

was for $451.00 and the male appears to have received hundreds of dollars in cash.

## VI.    CONCLUSION

93.    Based on the foregoing there is probable cause to believe that on October 22, 2025, ANTONIO BONHEUR, violated 7 U.S.C. § 2024(b), and 7 CFR § 278.2(a), by exchanging SNAP Benefits for cash, said benefits being valued more than $100 but less than $5,000.

94.    Based on the foregoing there is probable cause to believe that on October 16, 2025, SAUL ALISME, violated 7 U.S.C. § 2024(b), and 7 CFR § 278.2(a), by exchanging SNAP Benefits for cash, said benefits being valued more than $100 but less than $5,000

Sworn to under the penalties of perjury by telephone in accordance with Federal Rule of Criminal Procedure 4.1 on December _____15_____, 2025.

/s/ Todd Bucci
_____
Special Agent Todd Bucci
USDA-OIG

Electronically sworn to and subscribed telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on December ____15____, 2025.

_____
Hon. M. Page Kelley
United States Magistrate Judge